## THE CERVIN.

*(District Court, D. Maryland.   June 15, 1883.)*

SHIPPING—ACCEPTING PIER—DISCHARGING CARGO IN PORT—INJURY FROM EX-
POSURE—LIABILITY OF VESSEL.

A steam-ship having accepted a pier on the East river, New York, as a
suitable pier designated by the owners of the majority of the cargo for dis-
charging, is in fault in leaving the pier with part of the cargo on board, and
going to a pier in Brooklyn and there discharging the balance; and where the
cargo discharged in Brooklyn is injured by exposure to the sun on an unshel-
tered pier, the ship will be liable.

Measure of damage discussed.

In Admiralty.

*Marshall & Hall,* for libelants.

*A. Sterling, Jr.,* for respondents.

MORRIS, J.   The steam-ship, having accepted pier No. 47, East
river, as a suitable place in the port of New York, selected by the
owners of the majority of cargo, for the discharge of that portion
of the cargo which consisted of prunes, and having there discharged
725 hogsheads of the prunes, has not in any way justified her action
in leaving that pier, with the remaining 333 hogsheads on board, and
going across the harbor to Brooklyn.   It appears that when the libel-
ants complained of the removal of the steam-ship her agents prom-
ised to have the remaining prunes lightered across to pier No. 47,
when discharged from the ship.   This they did not promptly do, and
although they were notified by libelants that if the prunes were left
uncovered on the Brooklyn pier, exposed to the midsummer sun, they
would be damaged, no precautions whatever were taken, and they
remained exposed on the pier six days in June.

The respondents contend that as the libelants knew the prunes were
lying thus exposed they should have themselves protected them.   This
contention cannot be maintained.   The libelants had declined to ac-
cept delivery in Brooklyn, and the ship's agent had agreed to lighter
them to the New York pier.   The goods were, therefore, in the custody
to the carrier, and there was no delivery until they were put on the New
York pier, and it would have been altogether improper for the libel-
ants to interfere with them.   They performed their whole duty, in
my judgment, when they notified the ship's agents of the probable
consequences of the goods being exposed to the sun on the Brooklyn
pier.

. The testimony taken is voluminous, and is addressed principally to
the question whether in consequence of the exposure the goods were
really damaged, and if so, to what amount.   I take it that all the
testimony on this question has been put in, and that I am to decide
on the amount of damage without further reference to a master.

The libelants claim and they contend that the testimony they have
produced proves that the effect of exposing the 333 hogsheads of prunes

for six days unprotected on the pier, and lightering them over to New York, was that they became so soft that the juice escaped, deteriorating the fruit and staining the hogsheads; that fermentation, sourness, and mould ensued, and bugs were germinated. That this was a result to be expected from such exposure is also shown, and that the agents of the ship were warned of the danger of it. But on the question of what amount of pecuniary damage did result to this portion of the prunes there is the widest divergence in the testimony. The libelant's whole consignment consisted of 1,058 hogsheads. Of these, 725 hogsheads were discharged at pier No. 47, and immediately put into Driggs' stores without any exposure, and the remaining 333 hogsheads, which were exposed in Brooklyn, were put into Coe's stores. So that there was fair opportunity for observing the condition of the lots in these two distinct places of storage, and the difference between them. An examination was made of the fruit at Coe's stores about the twenty-second of June, 1880, on behalf of libelants, by two professional appraisers experienced in such goods, who had been employed to examine if the fruit had received any damage on the voyage of importation justifying a claim for reduction of customs duties. One of these two examiners has testified very positively that the prunes in Coe's stores were greatly damaged by exposure to the sun, and were markedly inferior to those in Driggs' stores, and he estimates that deterioration over and above the sea damage at 15 per cent. on the whole 333 hogsheads. This percentage, calculated on what is taken as the sound value, would amount to $4,183.30. An examination was also made by two expert appraisers, on the behalf of the respondents, about October 16th, some four months after the goods were all stored. They examined both lots, and testify that they could see no appreciable difference between them, —no difference which was capable of appraisement,—and that examining critically the numerous consignments which made the whole shipment, and which were each distinguishable by their several numbers, they found that those consignments which appeared in bad order in Coe's stores appeared in equally bad order when any hogsheads of the same serial numbers were to be found in Driggs' stores.

In this case the measure of damage should be the difference between the market price in New York of the goods which were delivered at Driggs' stores without any exposure, and those which were delivered at Coe's stores after the exposure in Brooklyn. The report of the libelant's appraiser, whose estimate puts the damage at such a large sum, is not, he concedes, based upon any knowledge of any actual difference of market prices. He bases his estimate on the difference, he says, which he found between the two lots of prunes, having himself first called attention to the exposed situation of those in Brooklyn. He then fixes this difference at a certain per centum of deterioration, and then assumes that this deterioration would affect the market price in the same ratio. In the direct conflict between

the appraisers employed by each party it would have been satisfactory to have had the testimony of merchants having actual knowledge of market prices, and proof of what effect on the market price had been caused by the damage complained of. The appraiser confesses that he knows nothing about prices, but only about the quality of the goods. It is shown that nearly all of the whole shipment was more or less damaged on the voyage of importation; that the cause was sea-water and heat of hold of vessel, and the effect produced was mustiness, mould, and fermentation in the fruit. For this unsoundness the libelants obtained, upon the survey and report of the custom-house appraisers, a reduction of duties based on an average damage of 9.97 per cent. It is not for speculative loss which the libelants are entitled to charge the ship, but for any actual loss; and they cannot recover in respect to any change in the condition of the prunes or the appearance of the packages which did not, in fact, affect their market value. It appears quite possible that the exposure complained of, while it did produce a change in the condition and appearance of the prunes when first put in store, may have but slightly affected their market price, as they were already an unsound and damaged shipment. In this connection the failure of the libelants to prove any actual difference in price is significant.

The evidence is very positive that prunes in casks are deteriorated by exposure to the heat of the sun, and that the six days' exposure which these hogsheads suffered in Brooklyn, by the default of the claimants, might reasonably be expected to affect them seriously, and that the effect was quite noticeable immediately after they were stored. At the survey, had some four months afterwards, the testimony of the witnesses is very conflicting as to how observable it was then. This goes to show that the ultimate consequences of the exposure were not so serious as was at first supposed. I cannot, however, escape the conviction that some deterioration did result, and some loss of market value. With the proof in the case, the nearest approximation to the amount of that loss which I am able to reach is this: By the second examination of the 333 hogsheads in Coe's stores, in October, it is pretty clearly shown that 163 casks did not then exhibit any appreciable damage. There is evidence that the remaining 170 hogsheads did exhibit a deterioration averaging 15 per cent.; but I am not convinced that this 15 per cent. was exclusive of the damage on the voyage of importation. I therefore deduct the sea damage at 10 per cent., leaving 5 per cent. as the damage from the exposure on the pier. As 6¼ cents per pound appears to be assumed as the sound value of the prunes, the 170 hogsheads, at that rate, would amount to $14,257, and 5 per cent. damage would amount to $711.85. For this amount of $711.85 I will sign a decree in favor of libelants.

The claim for extra cooperage is not supported by proof, and there is no proof of any actual loss of weight.